[No. D016608. Fourth Dist., Div. One. Sept. 13, 1994.]

CHERI L. CRAIG et al., Plaintiffs and Appellants, v.
CITY OF POWAY et al., Defendants and Appellants.

COUNSEL

Legal Aid Society of San Diego, Inc., Catherine A. Rodman, Gregory E. Knoll, Richard M. Steiner and Jonathan Lehrer-Graiwer for Plaintiffs and Appellants.

Benjamin Quinones, Janette E. Stokley, James W. Head, Goldfarb & Lipman, Raymond P. Bolanos, Lee C. Rosenthal and Peter Franklin as Amici Curiae on behalf of Plaintiffs and Appellants.

Stradling, Yocca, Carlson & Rauth, Donald J. Hamman and David H. Mann for Defendants and Appellants.

OPINION

NARES, J.—Plaintiff Cheri L. Craig, a low-income resident of the City of Poway, brought an action against Poway, Poway's city council, and the Poway Redevelopment Agency (collectively Agency), challenging various aspects of the Agency's implementation of its redevelopment plan.[1] Craig claimed inter alia (1) the Agency had not properly funded its low- and moderate-income housing fund (LMI Housing Fund or Fund) and (2) the Agency had improperly used money from the LMI Housing Fund to pay for a series of improvements to Pomerado Road, known as the Pomerado Road Improvement Project (Pomerado Road Project or Project).[2] The court sitting without a jury found the Agency had adequately funded its LMI Housing Fund, but issued a writ of mandate ordering the Agency to refund $239,949 plus interest to the LMI Housing Fund, reflecting the amount of LMI Housing Fund expenditures used for the Pomerado Road Project. Both parties appeal.

For the reasons explained below, we conclude the Agency's method of funding its LMI Housing Fund was improper and, accordingly, we reverse the portion of the judgment pertaining to the funding issue. We remand for the trial court to determine the amount, if any, the LMI Housing Fund is entitled to be reimbursed based on the Agency's funding practices between 1984 and 1990. In all other respects, we affirm the judgment.

[1] Aleen L. Smith was also a named plaintiff in the action. During the pendency of this appeal, Smith died. Smith's daughter, Doris D. Smith-Rake, is Smith's successor-in-interest for purposes of this appeal. For convenience, we will refer to plaintiffs collectively as "Craig."

[2] Craig asserted numerous other instances in which the Agency improperly used money from the LMI Housing Fund. Before trial, Poway acknowledged these expenditures had been improper and reimbursed the Fund. These expenditures were not at issue at trial or on this appeal. We therefore omit discussion of the facts underlying these claims.

I.

## ADEQUACY OF THE AGENCY'S METHOD OF FUNDING THE LMI HOUSING FUND

A. *The Applicable Law*

In 1952, the Legislature enacted the California Redevelopment Law to help local redevelopment agencies improve and revitalize blighted communities. (Health and Saf. Code,[3] § 33000 et seq.) Under the statutory scheme, a local redevelopment agency initially identifies a project area containing "blight" that will not be alleviated by private efforts. (§ 33367, subd. (d).) The agency then prepares a redevelopment plan directed at the development of residential, commercial, industrial or public structures "appropriate or necessary in the interest of the general welfare." (§ 33020, subd. (a).)

Redevelopment agencies have no power to tax. Instead, to finance their activities, they are funded primarily through tax increment financing. (§ 33670; *Redevelopment Agency* v. *County of San Bernardino* (1978) 21 Cal.3d 255, 259 [145 Cal.Rptr. 886, 578 P.2d 133]; *Bell Community Redevelopment Agency* v. *Woosley* (1985) 169 Cal.App.3d 24, 27 [214 Cal.Rptr. 788].) Under the tax increment system, the assessed value of property within a redevelopment project area is frozen when the redevelopment plan is adopted. (§ 33670.) For the duration of the redevelopment plan, the agency is entitled to the difference between the taxes levied on the base year assessed value and those generated from current assessed value. (*Ibid.*) This increase in, or "increment" of, property tax revenue is known as "tax increment revenue." Since redevelopment agencies receive tax increment revenue only to the extent they incur debt (§§ 33670, subd. (b), 33675), redevelopment agencies commonly finance redevelopment by issuing tax allocation bonds secured by an agency's future stream of tax increment revenue payments. (§§ 33640, 33641; *Bell Community Redevelopment Agency* v. *Woosley, supra*, 169 Cal.App.3d at p. 27; see generally, Schuster & Recht, *Tax Allocation Bonds in California After Proposition 13* (1983) 14 Pacific L.J. 159.)

To ensure that redevelopment agencies focus attention on creating affordable housing, the Legislature has mandated that 20 percent of the tax increment received by a redevelopment agency be set aside in a separate housing fund to be spent exclusively to improve and increase affordable housing opportunities. (§§ 33334.2, 33334.3; see *Lancaster Redevelopment*

---

[3]All further statutory references are to the Health and Safety Code unless otherwise specified.

*Agency* v. *Dibley* (1993) 20 Cal.App.4th 1656, 1658-1659 [25 Cal.Rptr.2d 593].) Section 33334.2, subdivision (a) provides in pertinent part: "Not less than 20 percent of all taxes which are allocated to the agency pursuant to Section 33670 shall be used by the agency for the purposes of increasing, [and] improving . . .[4] the community's supply of low- and moderate-income housing available at affordable housing cost . . . to persons and families of low or moderate income . . . , and very low income households . . . ."[5] Section 33334.3 states "[t]he funds . . . required by Section 33334.2 . . . shall be held in a separate Low- and Moderate-Income Housing Fund until used." The amount a redevelopment agency deposits into its LMI Housing Fund constitutes an "indebtedness" of the agency for purposes of determining the amount of tax increment revenue to which the agency is entitled. (§§ 33670, 33675, subd. (f).)

## B. *Events in This Case*

The facts relevant to the funding issue were undisputed by the parties and were set forth in a stipulated set of facts submitted to the court at trial.

Poway initially created its redevelopment agency (administered by the Poway City Council) in April 1983. On December 13, 1983, the Agency declared approximately 8,200 acres were "blighted" and adopted a redevelopment plan. The project area's tax base was frozen on that date. The Agency received annual tax increment revenue from 1984 through 1991. (§ 33670.) To achieve its redevelopment objectives, the Agency issued bonds in 1985, 1986, and 1989,[6] pledging 100 percent of its tax increment revenue to repay the bonds. In 1990, the Agency refinanced the 1985 and 1986 bonds by issuing new bonds. The official statement accompanying the 1990 bond issue specifically excluded the amounts required to be set aside in

---

[4] In 1990, the Legislature added the term "preserving" as one of the purposes of the LMI Housing Fund.

[5] The statute further provides that a redevelopment agency may avoid the 20 percent set aside requirement by making annual findings establishing: (1) "no need exists . . . to improve, increase or preserve the supply of low-and moderate-income housing"; (2) "a stated percentage less than 20 percent of the tax [increment] is sufficient to meet the housing needs of the community"; or (3) "the community is making a substantial effort to meet its . . . [affordable] housing needs, . . . consisting of direct financial contributions of local funds used to increase and improve the supply of [affordable] housing . . . ." The Agency never claimed to have come within one of these categories.

[6] Before trial, the parties stipulated that "neither the deposits or expenditures of bond proceeds from the 1989 bonds, attributable to the Housing Fund, are at issue in this lawsuit" and "reserved all rights with regard to deposits and expenditures of the 1989 bond proceeds."

the LMI Housing Fund as a potential source of repayment for the 1990 bond.[7]

Between 1985 and 1990, the Agency did not place 20 percent of the annual tax increment revenue in its separate LMI Housing Fund. Instead, based on advice from its independent auditors, the Agency decided to comply with section 33334.2's set aside requirement by placing 20 percent of its 1985 and 1986 net bond proceeds[8] into the Fund. The Agency refers to this practice as "forward funding."

In her complaint, Craig alleged the Agency's "forward funding" method violated sections 33334.2 and 33334.3 because it resulted in insufficient money deposited into the LMI Housing Fund. At trial, the parties agreed that 20 percent of annual tax revenue from fiscal years 1984 through 1990 would have left an accumulated total of *$5,624,637* and that the Agency's actual deposits into the LMI Housing Fund equaled *$7,819,503*. The Agency thus maintained that it had met its statutory obligation since it had deposited $2,194,866 over and above its 20 percent set aside mandate by 1991. Agreeing with the Agency's position, the trial court determined that Craig failed to show the Agency's method of funding its LMI Housing Fund violated the statutory scheme.

## C. *Analysis*

Craig contends the Agency's method of funding its LMI Housing Fund violated the law because under the circumstances the Agency was required to deposit into the LMI Housing Fund "*both* 20 percent of the proceeds of all Bond sales that pledge the [LMI] Housing Fund *and* 20% of the tax increment revenue received . . . ." (Italics in original.)

The key to understanding Craig's argument is to recall that the Agency initially pledged 100 percent of its *future tax increment* to repay the 1985 and 1986 bonds. Of that future tax increment, 80 percent is to be allocated to the general redevelopment fund and 20 percent is to be allocated to the LMI Housing Fund. (§ 33334.2, subd. (a).) Contending that the 20 percent portion of the future tax increment "belongs to" the LMI Housing Fund, Craig maintains the Agency was required to deposit 20 percent of the bond

---

[7]The statement provided: "The Bonds are payable solely from and are secured by Pledged Revenues to be derived from the Project Area, and the amounts on deposit in certain funds as described herein. . . . [¶] 'Pledged Revenues' consist of Tax Revenues available to the Agency . . . *less amounts set aside as required by law for low and moderate income housing purposes* . . . ." (Italics added.)

[8]Net bond proceeds are the bond proceeds remaining after deducting the costs of issuance of the bonds from the total bond issuance.

proceeds received as a result of the pledge into the LMI Housing Fund. According to Craig, the Agency must then *also* deposit the annual 20 percent tax increment into the LMI Housing Fund because that tax increment, required to be deposited into the Fund by section 33334.2, subdivision (a), is the source of money used to repay the bonds. Pursuant to this theory, the LMI Housing Fund is then responsible for paying the debt service on 20 percent of the bonds.

Craig thus takes the position that whenever a redevelopment agency pledges 100 percent of its future increment stream to pay debt service on bond proceeds, the LMI Housing Fund is entitled to (1) 20 percent of the net bond proceeds *plus* (2) 20 percent of the annual tax increment *minus* (3) debt service on the deposited bond proceeds. Our task is to determine whether such funding method is *mandated* by the relevant statutes.

Because there is no specific code section setting forth the consequences of a redevelopment agency's decision to capitalize its LMI Housing Fund,[9] we are required to determine legislative intent by viewing the statutory scheme as a whole, including a consideration of the legislation's background and the practical consequences flowing from the parties' respective positions. (See *Gardiner Solder Co.*v. *SupAlloy Corp., Inc.* (1991) 232 Cal.App.3d 1537, 1542 [284 Cal.Rptr. 206].) In so doing, it is important to understand the theory underlying the tax increment financing system.

The Legislature mandated that redevelopment agencies incur debt as a prerequisite to receiving tax increment revenue to ensure that agencies actively pursue redevelopment goals throughout the life of a redevelopment project. While it is not the only permissible method of incurring debt, redevelopment agencies most commonly issue bonds because sufficient tax increment revenues do not accrue in the beginning of a project. (See *Marek* v. *Napa Community Redevelopment Agency* (1988) 46 Cal.3d 1070, 1081, fn. 9 [251 Cal.Rptr. 778, 761 P.2d 701].) It is only when significant redevelopment has been accomplished and the total assessed value of the project area has risen that tax increment becomes a sufficient revenue source to support new projects. (*Ibid.*)

Thus, tax allocation bonds benefit a redevelopment agency's general fund in two ways. First, they entitle the agency to an immediate large deposit of capital (the bond proceeds). Second, because tax increment income generally

[9]The Agency and Craig agree that a redevelopment agency is permitted to pledge the Fund's future income to pay debt service on bonds. While such practice is not specifically authorized by the statutes, we agree the statutory scheme implicitly assumes an agency is entitled to capitalize its LMI Housing Fund in such manner. (See, e.g., §§ 33334.2, subd. (e)(9), 33641, subd. (c), 33334.12, subd. (g)(3)(B).)

increases over the life of the project (because the assessed value of the project increases due to the new development and construction) the redevelopment agency frequently earns an annual "profit" (the difference between the tax increment income and bond obligations).[10]

While the Agency agrees its LMI Housing Fund is entitled to the first benefit, an immediate large deposit of capital (20 percent of the bonds), it denies that the Fund has any right to benefit from the increased tax increment revenue. Craig counters that the LMI Housing Fund should have the opportunity to benefit when its future 20 percent allocation is capitalized in the same proportionate amount as does the general fund when its future 80 percent is capitalized. In other words, since the general fund earns a "profit" equal to the amount of the increased tax revenue minus the debt service payment, the LMI Housing Fund should have the opportunity to earn a similar "profit" calculated on 20 percent of the bond proceeds.

Craig's position is supported by several code sections. First, section 33334.2, subdivision (e)(9) specifically states that a redevelopment agency has the authority to use its LMI Housing Fund to "pay principal and interest on bonds, loans, advances, or other indebtedness . . . ." This authorization reflects the Legislature's awareness that an agency's LMI Housing Fund may be responsible for debt payments. Since the Legislature made clear the Fund could only be used for improving and increasing low and moderate income housing (§§ 33334.2, 33334.3), the Legislature must have assumed that any benefit from the debt payments would inure to the Fund to be used for low and moderate income housing, e.g., that the LMI Housing Fund should receive the bond proceeds when its future revenue is capitalized and that it should receive the tax allocation dollars to pay for the corresponding debt.

Underscoring this point, section 33334.3, subdivision (b) provides, "(b) Any interest earned by the [LMI Housing Fund] and any repayments or other income to the agency for loans, advances, or grants, of any kind from the [LMI] Housing Fund, shall accrue to and be deposited in, the fund and may

---

[10]We recognize it may not always be true that tax increment revenue will increase over time. However, Craig is not suggesting that the LMI Housing Fund is always entitled to benefit from the tax increment system; instead she maintains the Fund should have *the opportunity* to benefit in the same proportion as does the general fund. This position necessarily includes a recognition that the LMI Housing Fund could suffer a loss in the same proportion as the general redevelopment fund when total assessed value of the project area decreases.

only be used in the manner prescribed for the [LMI] Housing Fund."[11] The intent underlying this subdivision was to ensure that any interest or other income *earned by the Fund* would be used to benefit the Fund. Consistent with this principle, when the LMI Housing Fund is used to acquire more dollars in the present (e.g., when the Fund's future tax increment dollars are pledged), it is the LMI Housing Fund, rather than the general redevelopment fund, which should benefit from such capitalization.

Additionally, the Legislature provided that money contained in the LMI Housing Fund must be held in a "separate [fund] until used" (§ 33334.3, subd. (a); see also § 33675, subd. (e)) and mandated that the Agency maintain separate records of any "loan, advance, or indebtedness" that an Agency intends to pay from its LMI Housing Fund. (§ 33675, subd. (f).) This concept of the LMI Housing Fund as a completely separate fund suggests the Legislature intended that the Fund benefit fully when a bond is issued based on the *Fund*'s future income.

Finally, relying on their broad discretion to spend redevelopment funds in a manner best suited to the local community, redevelopment agencies have historically devoted their resources to the commercial sector, rather than low-income housing development. In response, the Legislature has repeatedly enacted amendments narrowing the agencies' discretion to ensure that the agencies place sufficient funds in their LMI Housing Fund and spend that money in an appropriate manner. Underlying this legislative activity is the recognition that "housing is . . . a fundamental purpose of the Community Redevelopment Law and [an] inadequate statewide supply of decent, safe, and sanitary housing affordable to persons and families of low or moderate income . . . threatens the accomplishment of the primary purposes of the Community Redevelopment Law . . . ." (See §§ 33334.6, subd. (a), 33071; *Lancaster Redevelopment Agency* v. *Dibley, supra,* 20 Cal.App.4th at p. 1658.)

To achieve this "fundamental purpose" of redevelopment law, a redevelopment agency must provide its LMI Housing Fund with sufficient resources to address community housing needs while the agency is funding new commercial development. However, annual tax increment generally does not provide sufficient working capital in the beginning of a project to permit the Fund to support any substantial housing development. (See *Marek* v. *Napa Community Redevelopment Agency, supra,* 46 Cal.3d at p. 1081, fn. 9.)

---

[11]The phrase "or any repayments or other income to the agency for loans, advances, or grants" was added to section 33334.3, subdivision (b) in 1990, after the events underlying this lawsuit took place. However, the statutory purpose remained the same—requiring that money earned by the LMI Housing Fund benefit the LMI Housing Fund rather than the general fund.

Moreover, withholding annual tax increment revenue from the LMI Housing Fund precludes the Fund from sharing in the growth of a redevelopment project. Thus, absent the Fund's entitlement to benefit from bond issuance (when its future revenue is pledged) in the same manner as does the general agency fund, the fundamental purpose underlying redevelopment law in this state would be defeated.

In contrast with the substantial statutory and public policy support underlying Craig's position, the Agency relies exclusively on section 33334.2, subdivision (a)'s statement that "[n]ot less than 20 percent" of tax increment revenue must be allocated to the LMI Housing Fund. The Agency says this language should be interpreted to mean that an Agency is *never* required to deposit any more than 20 percent of the tax increment revenue into the Fund. The Agency's argument is flawed.

First, there is no suggestion in the statutory language or legislative history of section 33334.2, subdivision (a) that the Legislature was intending to determine the consequences of a redevelopment agency's decision to capitalize its 20 percent future tax increment stream allocated to the LMI Housing Fund. Instead, the purpose of this code section was to mandate that a redevelopment agency set aside a minimum amount of its revenue for affordable housing purposes. Such mandate does not logically translate into a rule that the Fund is never entitled to benefit when its future revenue is pledged.

Additionally, the Agency's actual "forward funding" practice is inconsistent with its argument that the LMI Housing Fund is entitled to no more than 20 percent tax increment when its future income stream is capitalized. The Agency's decision to place 20 percent of the bond proceeds into the LMI Housing Fund reflects its recognition that the LMI Housing Fund is in fact entitled to at least some benefit from the capitalization of its future funds. The Agency provides no statutory support to show that the Fund is entitled only to the bond proceeds without also receiving its portion of the tax increment revenue.

Finally, we note that other code sections of the Community Redevelopment Law specifically state that a redevelopment agency is permitted to use its bond proceeds to satisfy other set-aside obligations. For example, in requiring agencies to set aside certain amounts in an education fund, section 33681, subdivision (c) provides: "In order to make the allocation required by this section, an agency may use any funds that are legally available . . . including . . . proceeds of bonds or other indebtedness . . . ." There is no similar provision stating that an agency is permitted to satisfy its section

33334.2 housing set aside requirement by using bond proceeds without also depositing the required tax increment revenue.

Viewing the statutory scheme as a whole and given the Legislature's historical emphasis on the importance of creating affordable housing opportunities in redevelopment projects, we conclude that when an agency capitalizes its future income stream attributable to the LMI Housing Fund, it is required to deposit the corresponding bond revenues into the Fund in addition to 20 percent of the annual tax increment. The Fund is then responsible for debt service for those bonds.

## D. *Application*

 The Agency next argues that we should uphold the trial court's ruling because even if the Agency was required to place 20 percent of the tax increment revenue plus 20 percent of the bond revenue into its LMI Housing Fund, there was no underfunding because in 1990 the Agency refinanced the 1985 and 1986 bonds by a new refunding bond which did not "pledge" the Housing Fund or the future 20 percent set aside to pay debt service.

If a redevelopment agency does not pledge the 20 percent portion of the future tax revenue, the LMI Housing Fund is not entitled to any more than 20 percent of the annual tax increment revenue. However, the fact that the Agency refinanced the bonds in 1990 and thus may not be required to deposit bond proceeds in the future does not necessarily mean that the LMI Housing Fund was made whole. As set forth above, between fiscal years 1984 and 1990, the LMI Housing Fund was entitled to (1) annual tax increment revenue plus (2) 20 percent of the 1985 and 1986 bond proceeds minus (3) debt service on the 1985 and 1986 bonds. The LMI Housing Fund was also entitled to any interest which would have been earned on those funds. (§ 33334.3, subd. (b).)

Assuming Craig can establish the amount of loss suffered by the LMI Housing Fund during these years, the Agency will then be required to reimburse the Fund for such amount. Because the resolution of this damage question may involve disputed factual issues, we remand for the trial court to determine the amount, if any, the LMI Housing Fund is entitled to be reimbursed based on the Agency's funding practices between 1984 and 1990.

## II.

### CROSS-APPEAL — POMERADO ROAD IMPROVEMENTS

### A. *Factual Background*

In 1984 Poway applied for a federal grant to provide funding for improvements to Pomerado Road, a multi-lane street running through Poway (the Pomerado Road Project or Project). Before applying for the grant, Poway's city manager had reported that "[t]he residential units [adjacent to Pomerado Road] are without an adequate system of noise attenuation . . . [and are] regularly impacted by adverse noise levels . . . significantly above the City's noise standard for single family residential areas." Poway also conducted an unverified survey determining that approximately 60 of the 90 households adjoining Pomerado Road were very low, low, or moderate income. The federal government thereafter awarded Poway a $1 million grant for the proposed construction.[12]

It soon became apparent that the federal money was insufficient to complete the Pomerado Road Project. To fill the gap, the Agency turned to the LMI Housing Fund. The Project, which began in 1986 and was completed in 1988, involved the construction of an eight-foot-high block soundwall, a sidewalk and related gutter and lighting improvements, stretching approximately a mile along Pomerado Road in Poway. Ultimately, the Agency used $239,949 from the LMI Housing Fund for the Project.

At trial, Craig claimed the Pomerado Road Project was not an appropriate expenditure of the LMI Housing Fund because (1) the Project did not "improve" or "increase" the housing supply, and (2) the Agency could not show the affected residences were "affordable" or occupied by "low or moderate income households." The evidence on these issues consisted of a stipulated set of facts and various written exhibits. After reviewing the evidence and listening to extensive argument by counsel, the court concluded the Agency's use of its LMI Housing Fund to pay for the Pomerado Road Project was improper because the Project did not increase or improve the supply of affordable housing. The court thereafter ordered Poway to reimburse the LMI Housing Fund in the amount of $239,949 plus interest. The Agency appeals.

---

[12]The federal government awarded Poway a Community Development Block Grant (CDBG) which is aimed at providing housing and economic opportunities to persons of low and moderate income. The parties agree "[t]here are different legal standards applicable to the expenditure of [LMI] Housing funds from those applicable to the expenditure of CDBG Funds."

## B. *Applicable Law*

In 1971, the Legislature declared that one of the fundamental goals of the Community Redevelopment Law was to increase the supply of low and moderate income housing. (§ 33071; *Lancaster Redevelopment Agency v. Dibley, supra*, 20 Cal.App.4th at p. 1658.) Five years later, redevelopment agencies were falling far short of achieving this goal.[13] The Legislature recognized that because tax increment financing relies on high assessed value growth, the tax increment financing system strongly discouraged redevelopment agencies from developing residential housing, particularly for low and moderate income households. In an attempt to address this problem, the Assembly proposed Assembly Bill No. 3674, containing the mandatory 20 percent set aside requirement for low and moderate income housing. In recommending that the Governor sign the bill, an Enrolled Bill Report explained that "[b]y mandating [the 20 percent set aside] . . . this bill will help achieve one of the long neglected goals of redevelopment—'to expand the supply of low and moderate income housing.'" (See Housing and Community Development Dept., Enrolled Bill Rep., Assem. Bill No. 3674 (1976-1977 Reg. Sess.) Sept. 1976.)

As enacted in 1976 and later amended in 1979 and 1984, section 33334.2 provided:

"(a) [The Fund] shall be used by the agency for the purposes of increasing and improving the community's supply of low- and moderate-income housing available at affordable housing cost, as defined by Section 50052.5, to persons and families of low or moderate income as defined in Section 50093, and very low income households, as defined in Section 50105 . . . ."[14]

"
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[13](See Housing and Community Development Dept., Enrolled Bill Rep., Assem. Bill No. 3674 (1976-1977 Reg. Sess.) Sept. 1976 ["the greatest failure of redevelopment has been in the field of housing"]; Dept. of Finance, Enrolled Bill Rep., Assem. Bill No. 3674 (1976-1977 Reg. Sess.) Sept. 1976 [noting that redevelopment agencies have been "subject to a number of criticisms" including that "[r]edevelopment projects, ostensibly created to expand housing, often have little housing within them"]; Office of Planning and Research, Enrolled Bill Rep., Assem. Bill No. 3674 (1976-1977 Reg. Sess.) ["A commitment is needed by redevelopment agencies to provide low and moderate income housing in blighted areas where the private market will not."].)

[14]During the relevant times, section 50052.5 provided " 'Affordable housing cost' means . . . housing cost not exceeding 25 percent of gross income." Section 50093 provided " 'Persons and families of low or moderate income' means persons and families whose income does not exceed 120 percent of area median income, adjusted for family size . . . ." Section 50105 provided " 'Very low income households' means persons and families whose incomes do not exceed qualifying limits for very low income families as established . . . pursuant to Section 8 of the United States Housing Act of 1937. . . ."

"(e) *"In carrying out the purpose of this section, the agency may exercise any or all of its powers, including the following*:

"(1) Acquire land or building sites.

"(2) *Improve land or building sites with onsite or offsite improvements.*

"(3) Donate land to private or public persons or entities.

"(4) Construct buildings or structures.

"(5) Acquire buildings or structures.

"(6) Rehabilitate buildings or structures.

"(7) Provide subsidies to, or for the benefit of, [low and very low] income households . . . .

"(8) Develop plans, pay principal and interest on bonds, loans, advances, or other indebtedness or pay financing or carrying charges." (Italics added.)

At trial, the Agency maintained the Pomerado Road Project constituted an "offsite improvement" within the meaning of section 33334.2, subdivision (e)(2), and therefore the LMI Housing Fund could properly be used to pay for the Project.

Since 1979, the Legislature has twice amended section 33334.2, subdivision (e)(2). First in 1988, the Legislature modified subdivision (e)(2) to read: "Improve land or building sites with onsite or offsite improvements, *"but only if the improvements directly and specifically improve or increase the community's supply of low-or moderate-income housing.*" (Italics added.)

Four years later and after the trial in this matter, the Legislature further modified section 33334.2, subdivision (e)(2) to read: "Improve real property or building sites with onsite or offsite improvements, *but only if either (A) the improvements are made as part of a program which results in the new construction or rehabilitation of affordable housing units for low- or moderate-income persons that are directly benefited by the improvements or (B) the agency finds that the improvements are necessary to eliminate a specific*

*condition that jeopardizes the health or safety of existing low-or moderate income residents.*" (Italics added.)

The parties and amicus curiae[15] agree these amendments reflected the Legislature's continuing concern that redevelopment agencies were misusing section 33334.2 subdivision (e)(2) as a broad loophole to fund community-wide infrastructure and commercial development without any connection to affordable housing. Although both sets of parties devote large portions of their appellate briefs in discussing the amendments, the parties agree that the pre-1988 version of the statute governs the action since the Pomerado Road Project was largely completed before the effective date of the amendments.[16]

## C. *Legal Analysis*

The pre-1988 version of section 33334.2 required redevelopment agencies to spend LMI Housing Fund money to "increas[e] and improv[e] the community's supply of [affordable] housing." (§ 33334.2, subd. (a).) The parties have stipulated that the Pomerado Road Project did not *increase* the number of affordable housing units in Poway. Thus, the sole question before us is whether the Pomerado Road Project "improved" the community's supply of affordable housing within the meaning of section 33334.2.

In addressing this question, the trial court decided—based primarily on section 33334.2's legislative history—that " 'improve' means . . . that you have to provide more, increase the number, that you have to rehabilitate, that you have to, in fact, for example, make available less expensive or make already inexpensive less expensive." Applying this definition, the court found the Agency's use of the LMI Housing Fund to pay for the Pomerado

---

[15]Community Economics, Inc., filed an amicus curiae brief in support of the plaintiffs' position that the LMI Housing Fund expenditures for the Pomerado Road Project were improper.

[16]The parties disagree, however, as to whether the amendments constituted a clarification of earlier legislative intent or reflected a change in existing law. Ironically, the parties take opposite positions as to each amendment. The Agency says the 1992 amendment constituted a clarification of earlier law, but that the 1988 constituted a change in the prior law. Craig says the 1988 amendment constituted a clarification of prior law, but that the 1992 amendment constituted a change in the law.

Based on our analysis on the legislative history of the 1992 amendment, the Legislature was intending that this amendment change prior law by generally narrowing the circumstances under which an agency could use LMI Housing Fund expenditures to fund offsite construction. (See Conf. Rep., Analysis of Sen. Bill No. 1711 (1991-1992 Reg. Sess.) Aug. 1992, p. 2.) We need not decide whether the 1988 amendment constituted a substantive change since under either version, the Agency needed to establish a nexus between the expenditures and the goal of improving and increasing affordable housing. In this case, no such nexus was established.

Road Project was improper because the Project did not create *more* affordable housing.[17]

■ The trial court's definition violates the plain meaning rule of statutory construction. Statutory language is generally the best and most reliable index of a statute's meaning. (See *Burden* v. *Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].) "The Legislature is presumed to have meant what it said and the plain meaning of the language will govern the interpretation of the statute." (*In re Khalid H.* (1992) 6 Cal.App.4th 733, 736 [8 Cal.Rptr.2d 414].)

As Craig concedes, "improving" must mean something different from "increasing"; otherwise the Legislature's use of both words would have been superfluous. The dictionary supports such distinction. ■■ Whereas "increase" is generally defined as "to become greater or larger," the dictionary defines "improve" to mean "to bring into a more desirable or excellent condition . . . to make (land) more useful, profitable, or valuable by enclosure, cultivation, . . . to increase the value of (real property) by betterments, as the construction of buildings and sewers . . . ." (Random House Dict. of the English Language (2d ed. 1987) p. 963.) Applying this definition, the Agency could properly use the LMI Housing Fund for any project which brought affordable housing into a better condition, regardless whether the project resulted in an increase of affordable housing units.

---

[17]The trial court's explanation of its ruling was as follows:

". . . I do not think it necessary for me to make a finding as to whether or not the 1988 amendment which came into existence both before and after this money was spent was a change in the law or was simply a refinement of and clarification of existing law because I find that even under the initial language, that, in fact, this particular project does not meet the requirement of improving.

"Now, in coming to that conclusion, in looking back at the legislative history that initially defined [section] 33334.2, the legislative history indicates that the money could be used to acquire land or structures or to the rehabilitation of property. There was no mention of off-site improvements. Later, off-site was included, but certainly it seems to me that even when off-site was included, that there had to be some relationship between that off-site improvement and the manner in which it tied into improving and increasing affordable low and moderate housing.

"It seems to me that the defendant's argument that the Pomerado Road improvements, primarily the sound wall and some of the streets and gutters, made things better, is not persuasive to me. In that regard, it seems to me that the word 'improve' means—suggests that you have to provide more, increase the number, that you have to rehabilitate, that you have to, in fact, for example, make available less expensive or make already inexpensive less expensive.

"The City's and Redevelopment Agency's argument really to me that the improvement perhaps made things more pleasant, but it did not improve within the meaning of the statute. Accordingly, since it was, in fact, not a proper use, that $235,000 needs to be returned to the Housing Fund with interest."

Craig urges us to decline to apply the plain meaning definition because it is contrary to section 33334.2's legislative history. As outlined above, there is no question but that the primary purpose of section 33334.2 was to compel redevelopment agencies to increase the supply of affordable housing. However, a court has the authority to disregard the plain meaning of a statute only where such interpretation would produce an absurd result or would frustrate the manifest purpose of the legislation considered as a whole. (*Granite Construction Co.* v. *Superior Court* (1983) 149 Cal.App.3d 465, 469 [197 Cal.Rptr. 3, 45 A.L.R.4th 1011].) In 1976, the Legislature could have legitimately concluded that the ultimate goal of creating more affordable housing could be indirectly satisfied by means of *improving* the housing available to low income persons. Thus, the use of the LMI Housing Fund to make existing housing better would not necessarily "frustrate the manifest purpose" of this legislation.

In reaching this conclusion, we find it significant that in 1988 the Legislature, concerned with agency abuses in funding offsite improvements, amended section 33334.2, subdivision (e)(2) to read that offsite improvements were permissible "only if the improvements directly and specifically *improve or increase* the community's supply of low- or moderate-income housing." (§ 33334.2, subd. (e)(2), italics added.) Had the Legislature been concerned that the LMI Housing Funds were not being used to *increase* the supply of housing, it could have said "but only if the improvements increase the supply of affordable housing." The Legislature did not do so. We cannot ignore the word "improve" and must assume the Legislature added it to serve a purpose.

Craig also argues that we should decline to apply the dictionary definition of "improving" because such definition would create a loophole permitting redevelopment agencies to fund "beautification" projects such as adding a new park or a community swimming pool. Such argument, however, ignores the requirement (applicable under the pre-1988 version of the statute or under the 1988 amended version) that there exist a nexus between the LMI Housing Fund expenditures and the goal of improving the community's supply of affordable housing. (See § 33334.2, subds. (a) and (e).) A redevelopment agency must establish a direct link between the use of the LMI Housing Fund and the beneficial change in the *condition* of the affordable housing supply. Although construction projects such as a park or a pool could certainly be viewed as improving the quality of life of the neighborhood residents, an agency generally could not reasonably establish that a park or a pool directly and specifically improved affordable *housing*.

Finally, we note that as originally written, section 33334.2, subdivision (e)(2) did appear to be directed towards permitting offsite improvements made *in connection with* developing new affordable housing units.

Whereas subdivision (e)(2) stated the agency was permitted to "improve *land* or *building sites* with onsite or offsite improvements," other subsections referred to "*buildings* or *structures*." (See §§ 33334.2, subd. (e)(4) ["Construct *buildings* or *structures*"]; 33334.2, subd. (e)(5) ["Acquire *buildings* or *structures*"]; 33334.2, subd. (e)(6) ["Rehabilitate *buildings* or structures"].) ■ A "building site" as used by the Legislature and the courts has generally meant a parcel of undeveloped land in which a structure may legally be built. ■ Thus, based on the statutory language it appears that the Legislature was expressly permitting an agency to provide money for offsite infrastructure necessary for new construction.

This conclusion, however, does not support a limitation on an agency's powers. During the relevant time, section 33334.2, subdivision (e) stated that a redevelopment agency could exercise "any or all of its powers" to serve the purpose of increasing and improving the supply of affordable housing, "including" subdivisions (1) through (8). The term "including" is ordinarily a word of enlargement and not of limitation. (See *People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 639 [268 P.2d 723].) Section 33334.2, subdivision (e)(2) (as it existed in 1986) did not limit the types of offsite construction projects which could be funded by an agency's LMI Housing Fund.[18]

## D. *Applying the Statutory Test to the Factual Record*

■ Accordingly, to prevail in this action the Agency was required to show the LMI Housing Fund expenditures for the Pomerado Road Project served to directly improve affordable housing for very low and low and moderate income households. (§ 33334.2.)

Viewing the evidence in the light most favorable to the Agency, the evidence at trial established that before the Pomerado Road Project the homes adjacent to Pomerado Road were "regularly impacted" by adverse noise levels above city and federal standards and that children walked to school along Pomerado Road without sidewalks. After the Project

---

[18]We further reject the plaintiffs' suggestion that we create a three-part test which an agency must satisfy before LMI Housing Funds may be spent on offsite improvements: the offsite improvements must be (1) related to an ongoing "onsite" housing project; (2) necessary to build the housing project; and (3) necessary to alleviate the "imminent danger" of removal of low income households. The plaintiffs say this test reflects legislative intent in adopting section 33334.2. While this may be true, there is no basis for us to rewrite the statute. Rather, our judicial role is to apply the statutory language as it was written by the Legislature. Because section 33334.2—as it existed in 1986 through 1988—did not limit the use of the LMI Housing Fund to projects which increased or prevented a decrease in the number of affordable housing units, we cannot graft such requirement onto the statutory language.

was completed, Pomerado Road contained a sound attenuation wall and sidewalks.

The Agency concedes that other than showing the nature of the problem, it did not present any evidence establishing the expenditures "improved" housing. There was, for example, no evidence that the Project made the sound problem better or in any other way had a beneficial effect on the *homes* in the neighborhood. The fact that a "problem" may exist is different from showing an expenditure in fact served to improve the community's supply of affordable housing.

Recognizing the absence of any relevant evidence on the "improvement" issue, the Agency maintains that the trial court erroneously "ruled to exclude all testimony on the Pomerado Project," citing the reporter's transcript. According to the Agency, the court refused "to hear *any* testimony regarding the noise condition in the neighborhood, the deteriorating condition accompanying the noise, and the vast improvements in the neighborhood since the project was installed." These claims are unsupported by the record.

Before trial, the parties disagreed whether any witness testimony would be necessary at trial. In an attempt to resolve this issue, Craig filed a motion *in limine* seeking to exclude evidence as to the state of mind of City and Agency personnel in implementing Poway's redevelopment plan, arguing such testimony was not relevant. During the hearing on the motion, the Agency's counsel asserted: ". . . I think that another basis that testimony is appropriate is to inquire into the propriety of the expenditures on Pomerado Road. The question of whether or not the improvements benefited low and moderate income housing, for example, we thought that that was directly relevant and that a witness would be able to come in and clarify for the court exactly what was done, if that's an issue, could clarify what types of people live there, things of that sort, maybe talk about the adequacy of the questionnaire that was handed out which was challenged . . . . But we think for that reason testimony also would be relevant, potentially relevant depending on the ruling on the law to the issue on Pomerado Road as well." The court and counsel then engaged in a colloquy concerning the difference between the meaning of a "low and moderate income household" (which requires the household income to be below a certain level) and the meaning of "affordable" housing (which requires that the housing cost is no more than 25 percent of the household income). The following then occurred:

"The Court: Okay. All right. . . . The [income] survey says what it says or doesn't say. We know . . . it's not verified. . . . So what more are the City people going to tell me that I don't already have?

"Mr. Hamman [The Agency's counsel]: On just the income-eligibility portion of it, they are not going to add anything.

"The Court: *All right. Then what is relevant that they could tell me about the issue of Pomerado Road?*

"Mr. Hamman: [Discussing proposed witness testimony establishing that the affected homes are affordable.]

"The Court: See, and I don't see any of that as being relevant. As I see it, the issue is there evidence to support the City's contention that the houses that abut Pomerado are, in fact, income-eligible.

". . . . . . . . . . . . . . . . . . . . . . . .

". . . And if the answer to that question is yes, then we go into the question of whether or not these improvements are allowable improvements under . . . section 33334.2.

"Mr. Hamman: I wouldn't disagree with that, your honor. I think that . . . there is sufficient evidence before the court and we would not want to supplement it or anything else, to show the percentage of families in those homes or the percentage of residents who qualify as low and moderate income people.

"The Court: Okay. *Then I am not going to allow any further testimony on that. . . .*

"Mr. Hamman: Okay. Thank you for that clarification." (Italics added.)

The court clearly precluded the Agency from introducing evidence of the *affordability* of the neighborhood adjacent to Pomerado Road.[19] However, as reflected above, the court never prevented the Agency from presenting evidence that the Project *improved* the housing adjacent to Pomerado Road. If the court's ruling was ambiguous in any way, it was the Agency's responsibility to make it clear on the record that it wanted to present the evidence or that it was being precluded from doing so. By failing to do so, the Agency waived its right to claim evidentiary error on appeal.

Applying the plain meaning of "improving" to the record in this case, we conclude the Agency failed to establish the requisite nexus between the

---

[19]We agree with the Agency that this ruling was erroneous. However, this error does not require that we remand this case since the Agency failed to establish there was any "improvement" regardless whether the affected homes were "affordable" within the meaning of sections 33334.2 and 50052.5.

Pomerado Road Project and the statutory goal of "improving" affordable housing.

## III

### TIMELINESS OF THE LAWSUIT

The Agency contends the court erred in failing to determine that Craig's complaint, filed on July 2, 1990, was barred by the statute of limitations or by the laches doctrine.

### Statute of Limitations

The parties agree this action is governed by Code of Civil Procedure section 338, subdivision (a), establishing a three-year limitation period for liabilities created by statute. ■ The Agency says that because the LMI Housing Fund expenditures for the Pomerado Road Project were approved in 1986, this lawsuit, filed more than three years later, was untimely.

Generally, a statute of limitation runs upon the last element essential to the cause of action even if the plaintiff is unaware of the cause of action. (See *Mangini* v. *Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1150 [281 Cal.Rptr. 827].) However, "[t]he harshness of that rule has been ameliorated in cases where it would be manifestly unjust to deprive a plaintiff of a cause of action before he is aware he has been injured." (*Ibid.*) A cause of action under this discovery rule accrues when the plaintiff has actual notice of the injury or information of circumstances to put a reasonable person on inquiry. (*Ibid.*)

Here, the record establishes that the LMI Housing Fund expenditures for the Pomerado Road Project were made between 1986 and 1988. Craig asserted at trial that she had no actual or constructive notice that the Agency had used its LMI Housing Fund for the Pomerado Road Project until much later in the process. To support this claim, she pointed out that there was no public notice that the money to pay for the Pomerado Road Project came from the LMI Housing Fund. Based on this record, the court could legitimately conclude that the discovery rule applied to toll the limitations period through the time that Craig actually filed the lawsuit.

### Laches

■ The defense of laches requires "unreasonable delay in bringing suit 'plus either acquiescence in the act about which plaintiff complains or

prejudice to the defendant resulting from the delay.' " (*Miller* v. *Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624 [166 Cal.Rptr. 826, 614 P.2d 258], quoting *Conti* v. *Board of Civil Service Commissioners* (1969) 1 Cal.3d 351, 359 [82 Cal.Rptr. 337, 461 P.2d 617], fns. omitted.) There was substantial evidence in the record supporting the trial court's implicit finding that Craig did not unreasonably delay bringing suit. Additionally, the evidence showed that Craig never acquiesced in the allegedly wrongful acts and that the Agency was not unfairly prejudiced because the lawsuit was not filed until 1990. The court did not abuse its discretion in refusing to find that the laches doctrine barred the lawsuit.

## DISPOSITION

We remand for the trial court to determine the amount, if any, the LMI Housing Fund is entitled to be reimbursed based on the Agency's funding practices between 1984 and 1990. In all other respects, we affirm the judgment. Plaintiffs to recover costs on appeal.

Todd, Acting P. J., and Huffman, J., concurred.