[No. D039163. Fourth Dist., Div. One. July 29, 2003.]

HOGAR DULCE HOGAR, Plaintiff and Appellant, v.
COMMUNITY DEVELOPMENT COMMISSION OF THE CITY OF
ESCONDIDO et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION[1]]**

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of Discussion part II.

**COUNSEL**

San Diego Advocates for Social Justice, Catherine A. Rodman; Post, Kirby, Noonan and Sweat and R. Bruce Wayne for Plaintiff and Appellant.

Jeffrey R. Epp, City Attorney, Jennifer K. McCain, Assistant City Attorney; Hogan, Guiney, Dick and Michael M. Hogan for Defendants and Appellants.

## Opinion

**BENKE, J.—** ▇ Under the Community Redevelopment Law (Health & Saf. Code,[2] § 33000 et seq.) (CRL), local redevelopment agencies receive so-called tax increment funds generated by redevelopment projects they have initiated. The CRL requires that 20 percent of such tax increment funds be placed in a Low and Moderate Income Housing Fund (Housing Fund). The Legislature has directed that, in general, Housing Fund proceeds should be used to increase, improve or preserve a community's supply of housing affordable to very-low-low-, and moderate-income individuals and families.

In this case an unincorporated association, plaintiff and appellant Hogar Dulce Hogar[3] (Hogar), challenged the manner in which defendant and appellant Community Development Commission of the City of Escondido (the agency) calculated payment to its Housing Fund. In its 1997 complaint, Hogar alleged that in calculating the amount it paid into the Housing Fund, the agency had unlawfully deducted from its *gross* tax increment receipts amounts it had agreed to pay the County of San Diego (the county) and then paid the Housing Fund 20 percent of its *net* tax increment receipts. Hogar asserted the CRL requires that 20 percent of *gross* tax increment funds be placed in the Housing Fund as opposed to the 20 percent of *net* tax increment funds the agency paid into the fund.

The trial court agreed with Hogar. The trial court found that under the CRL the agency was required to pay the fund 20 percent of its gross, rather than net, tax increment receipts. The trial court ordered that the agency reimburse the fund the amounts which should have been paid into the fund from the time the fund was established in 1985 until the date of the judgment.

We reverse in part. Under the applicable statute of limitations, the trial court could only order reimbursement of the Housing Fund for a period commencing three years before Hogar's complaint was filed. Contrary to the trial court's finding, the discovery rule by which the statute of limitations is tolled until the plaintiff discovers the factual basis for a cause of action, has no application in this case. Where, as here, no individual has asserted any individual loss, and a public entity's violation of a statutory duty has been disclosed in public hearings and public records, the discovery rule is not necessary to protect the plaintiff's substantial rights. Moreover, use of the discovery rule in this context could unduly disrupt a public entity's ability to operate with fiscal certainty.

---

[2] All further statutory references are to the Health and Safety Code unless otherwise specified.

[3] The English translation of this name is "Home Sweet Home."

## BACKGROUND

### 1. *The Agency*

The agency became operative under section 34115 in 1985. Under the CRL, at the time a redevelopment area is designated, the amount of property tax revenues which are then being collected in the redevelopment area and remitted to various governmental agencies is frozen and the redevelopment agency is permitted to retain solely for redevelopment purposes any increase or increment in property taxes realized thereafter. (§ 33670; *Craig v. City of Poway* (1994) 28 Cal.App.4th 319, 325 [33 Cal.Rptr.2d 528].) As is often the case, at the time it adopted its redevelopment plan, the agency entered into an agreement with the county under which the agency agreed it would remit to the county a portion of the tax increment it realized.[4] Under the terms of the tax sharing agreement, the county, which collected the taxes, retained a percentage of the gross tax increment and remitted the balance to the agency.

As we have noted, the CRL requires that redevelopment agencies set aside 20 percent of their tax increment receipts in a Housing Fund devoted to increasing the availability of low-cost housing in redeveloped areas. (§ 33334.2, subd. (a).)[5] With respect to the agency's Housing Fund obligations, the tax sharing agreement provided the amounts retained by the county "shall not constitute a receipt of tax increment by the agency for the purposes of Health and Safety Code Section 33334.2." The agreement further provided that in the event a final court judgment determined this aspect of the agreement was invalid, "any future amounts payable to the County under this Agreement shall be reduced by twenty percent (20%). Reimbursement of payments already made to the County shall be limited to those not barred by the applicable statute of limitations."

---

[4] Such agreements are now governed by section 33607.5. In regulating the provisions of tax sharing agreements, the Legislature found: "Prior to the enactment of the Community Redevelopment Law Reform Act of 1993 (Stats. 1993, ch. 942), negotiated agreements between redevelopment agencies and counties, special districts, or schools often led to redevelopment project areas that were not truly blighted, thereby increasing both the size of project areas and the amount of local property taxes diverted to redevelopment activities." (Stats. 1995, ch. 141, § 1; see Historical and Statutory Notes, 41A West's Ann. Health & Saf. Code (1999 ed.) foll. § 33607.5.)

[5] Section 33334.2, subdivision (a), states in pertinent part: "Not less than 20 percent of all taxes that are allocated to the agency pursuant to Section 33670 shall be used by the agency for the purposes of increasing, improving, and preserving the community's supply of low- and moderate-income housing available at affordable housing cost, as defined by Sections 33334.22 and 50052.5, to persons and families of low or moderate income, as defined in Section 50093, lower income households, as defined in Section 50079.5, very low income households, as defined in Section 50105, and extremely low income households, as defined in Section 50106, that is occupied by these persons and families."

In light of its agreement with the county, the agency only paid its Housing Fund 20 percent of the net amount it received from the county rather than 20 percent of the gross amount of tax increment receipts to which it was entitled. In 1989 the agency was advised by its own counsel that this method of calculating the amount due the Housing Fund was improper and that it was required to pay the Housing Fund 20 percent of the gross tax increment. The underfunding issue was discussed at a public meeting and the agency contacted the county in an effort to amend the tax sharing agreement. The county responded by stating that in the event the validity of the tax sharing agreement was challenged, the county would assist the agency in defending the agreement. However, the county was unwilling to amend the tax sharing agreement or otherwise provide the agency any relief from the provisions of the agreement.

In 1990 the agency sued the county and argued provisions of the tax sharing agreement had to be modified so the agency could comply with provisions of section 33334.2, subdivision (a). In 1992 the trial court in that action granted the county's motion for summary judgment. The court found that the agency, notwithstanding its obligations under the CRL, was bound by its agreement with the county until a third party had obtained a judgment invalidating it. Because no third party had challenged the agreement, the trial court found the agency was not entitled to any relief.

In 1997 the state Controller notified the agency its method of calculating its contribution to the Housing Fund was improper. In the face of the state Controller's notice, in 1998 the county agreed to amend the tax sharing agreement so the agency would be able to pay the Housing Fund 20 percent of its gross tax increment receipts.

2. *Hogar*

Hogar was formed as an unincorporated nonprofit association in 1997. Its members are low-income residents of the agency. In 1998 Hogar filed a petition for a writ of mandate and complaint for declaratory relief. Hogar alleged the agency and defendant and appellant the City of Escondido (the city) had failed to make proper contributions to its Housing Fund, had used the fund improperly and had failed to make required annual reports about the fund. Eventually, the trial court certified the action as a class action brought on behalf of very-low-income and low-income residents of the city. The agency and the city answered the petition and complaint and brought a cross-complaint against the county.

The matter was heard by the trial court, which rendered a statement of decision. As indicated, the trial court found the agency's initial calculation of the amounts due the Housing Fund was improper and ordered the agency to

reimburse the Housing Fund the amounts due under the CRL from 1985 through the time of trial. The parties agree that, with interest, this amounted to $5.6 million. The trial court denied Hogar's remaining claims for relief. Because no final judgment had been entered, the trial court found that the agency was not yet entitled to any indemnity under the terms of the tax sharing agreement.

Judgment was entered on the statement of decision.

Hogar filed a timely notice of appeal and the agency filed a cross-appeal.

## DISCUSSION

## I

For purposes of clarity, we first take up the agency's standing and statute of limitations contentions.

### A. *Hogar's Standing*

Initially, the agency challenges Hogar's standing to obtain relief with respect to acts which occurred before it came into existence in 1997. The agency argues that with respect to funds which should have been paid into the Housing Fund before Hogar was created, Hogar has no beneficial interest. We reject this aspect of the agency's cross-appeal.

■ Although the general rule requires that a mandamus petitioner have some beneficial interest in the relief it seeks (see *Nowlin v. Department of Motor Vehicles* (1997) 53 Cal.App.4th 1529, 1537 [62 Cal.Rptr.2d 409]; Code Civ. Proc., § 1086), this requirement is relaxed " ' " '[w]here the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty.' " ' " (*Nowlin v. Dept. of Motor Vehicles, supra,* 53 Cal.App.4th at pp. 1537–1538.) This "exception promotes the policy of guaranteeing citizens the opportunity to ensure that no government body impairs or defeats the purpose of legislation establishing a public right." (8 Witkin, Cal. Procedure (4th ed. 1997) Extraordinary Writs, § 83, pp. 870–872; see also *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 439 [261 Cal.Rptr. 574, 777 P.2d 610]; *Green v. Obledo* (1981) 29 Cal.3d 126, 144 [172 Cal.Rptr. 206, 624 P.2d 256].)

The agency has not cited and we have found no case in which relief permitted under the "public right" exception to the beneficial interest rule has been limited by the fact the plaintiff was a public interest group entity formed sometime after a challenged governmental practice commenced. Such a limitation would seem to be inconsistent with the rationale of the exception,

which is to permit citizens and organizations to enforce limitations on governmental action and require governmental agencies to fulfill their responsibilities. (See *Common Cause v. Board of Supervisors, supra,* 49 Cal.3d at p. 432.) Moreover, preventing Hogar from obtaining any relief for acts which occurred before it came into being would ignore the practical reality that public interest groups, such as Hogar, are oftentimes formed as a result of particular governmental action and that such public interest groups may be the only parties with the wherewithal to mount a successful challenge to unlawful governmental action. In short, the fact a petitioner did not exist at the time a governmental agency began disregarding its statutory obligations is not a persuasive reason to entirely excuse a governmental agency's failure to meet these obligations.[6]

## B. *Statute of Limitations*

Under Code of Civil Procedure section 338, subdivision (a), "[a]n action upon a liability created by statute, other than a penalty or forfeiture" must be brought within three years. The parties agree that Hogar's underfunding claim is governed by Code of Civil Procedure section 338, subdivision (a).

The statute of limitations accrues when a plaintiff has the right to sue on a cause of action. (*Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 187 [98 Cal.Rptr. 837, 491 P.2d 421].) When an obligation or liability arises on a recurring basis, a cause of action accrues each time a wrongful act occurs, triggering a new limitations period. (*Jones v. Tracy School Dist.* (1980) 27 Cal.3d 99, 105 [165 Cal.Rptr. 100, 611 P.2d 441].) The continuing accrual rule has been applied in a variety of actions involving the obligation to make periodic payments under California statutes or regulations. (See e.g. *Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 818–825 [107 Cal.Rptr.2d 369, 23 P.3d 601] [taxes]; *Green v. Obledo, supra,* 29 Cal.3d at pp. 140–142 [welfare benefits]; *Jones v. Tracy School Dist., supra,* 27 Cal.3d at pp. 105–107 [wages]; *Dryden v. Board of Pension Commrs.* (1936) 6 Cal.2d 575, 580–582 [59 P.2d 104]

---

[6] In this regard we also take note of the provisions of the tax sharing agreement between the agency and the county. The agency and the county expressly recognized that because the tax sharing agreement diminished the amount paid into the Housing Fund, the agreement was subject to attack under the CRL. However, because of the clear fiscal advantages the agreement provided, the agency and the county were nonetheless willing to run the risk the agreement would be successfully challenged and reimbursement required. They also expressly recognized the scope of their reimbursement risk would be limited by the applicable statute of limitations. The agency's proposed limitation on the standing of public interest petitioners would provide a further substantial limitation on the reimbursement risk and in that sense would provide the agency and the county with more fiscal advantage than even they expected. Thus in this context, reducing the relief Hogar can obtain solely because it was formed in 1997 would not encourage local agencies to fulfill their statutory obligations.

[pension benefits].) In instances of long-standing statutory violations, the continuing accrual rule effectively limits the amount of retroactive relief a plaintiff or petitioner can obtain to the benefits or obligations which came due within the limitations period. As the court in *Green v. Obledo* stated with respect to wrongfully withheld welfare payments: "Our courts have viewed the obligation of a governmental entity to pay welfare benefits pursuant to law as a debt due the recipient as of the date he first became entitled to them. [Citations.] Such a debt is analogous to the obligation of a governmental entity to make payments of back wages unlawfully withheld from its workers or of pension benefits unlawfully withheld from its retirees: each such payment becomes a debt due to the employee as of the date he was entitled to receive it. It is settled that in such cases each deficient payment constitutes a separate violation triggering the running of a new period of limitations, and hence that the employee can recover only those payments which accrued within the period of the applicable statute of limitations preceding the filing of his complaint. [Citations.]" (*Green v. Obledo, supra,* 29 Cal.3d at p. 141.)

Importantly, the court in *Green v. Obledo* went on to point out that the limitations period might, in particular cases, be shortened even further than what is permitted under the continuing accrual rule. "In distinction to a suit brought by an individual claimant for his own account, an action by an entire class to recover past welfare benefits withheld pursuant to an invalid regulation or statute might impose, in some circumstances, a disproportionate clerical and financial burden on the governmental entity if such benefits were ordered paid for the entire period of limitations. This could occur, for example, if the regulation or statute had been in force for a number of years at the time of the judgment, if the class were particularly large, or if the potential individual recovery of each class member were small. Accordingly, on such a showing the trial court, acting as a court of equity, has discretion to fix a more realistic starting date for the payment of retroactive benefits to class members." (*Green v. Obledo, supra,* 29 Cal.3d at 142.)

Hogar's claims with respect to the amount the agency should have paid the Housing Fund are subject to the continuing accrual rule. The tax increment is allocated and paid to the agency annually. (§§33670, subd. (b), 33675, subd. (a).) Thus the agency's obligation to pay the Housing Fund 20 percent of its tax increment receipts was a recurring annual duty and a cause of action arose each year when the agency failed to pay the fund 20 percent of its gross tax increment receipts. Under Code of Civil Procedure section 338, subdivision (a), the agency could only be required to reimburse the Housing Fund amounts due in the three years preceding the date Hogar filed its complaint.

 Contrary to the trial court's finding, the agency's violations of section 33334.2, subdivision (a), were not subject to a delayed discovery rule.

In general, a plaintiff's ignorance of a cause of action does not toll the running of the statute. (*Neel v. Magana, Olney, Levy, Cathcart & Gelfand, supra,* 6 Cal.3d at p. 187.) An exception to the general rule has arisen and in a number of instances the statute of limitations has been tolled until the date the plaintiff knew or should have known the factual basis of a claim. Delayed discovery has been adopted to protect plaintiffs who are ignorant of their right of action through no fault of their own. (*Naftzger v. American Numismatic Society* (1996) 42 Cal.App.4th 421, 428 [49 Cal.Rptr.2d 784].)

■ However, a discovery rule is not appropriate, where as here, a public agency's violation of a statute is a matter of public record and the violation is being asserted by a plaintiff which has no direct beneficial interest in the outcome of the litigation. In *Utility Cost Management v. Indian Wells Valley Water Dist.* (2001) 26 Cal.4th 1185, 1197 [114 Cal.Rptr.2d 459, 36 P.3d 2], the plaintiff asserted a discovery rule in an action to recover utility charges which exceeded statutory limits. In rejecting a discovery rule, the court stated: "In other contexts, we have recognized a 'discovery rule' that tolls the statute of limitations until the date the plaintiff knew or should have known the factual basis of the cause of action. [Citations.] Here, however, the law requires public utilities to make available information establishing that their capital facilities fees are not excessive. [Citation.] Therefore, a diligent plaintiff should be able to discover, within the statutory period, whether a cause of action exists. Tolling might of course be appropriate during the period a pubic utility is processing a request for information prior to disclosure, but we think a broader application of the discovery rule would be directly at odds with the legislative intent to give public utilities certainty with respect to the enforceability of their fee ordinances and resolutions. [Citations.] If a plaintiff could challenge fee legislation any number of years after the legislation was adopted simply by taking advantage of the discovery rule and without any allegation that critical information was withheld, then public utilities would be left in a continuous state of fiscal uncertainty, which ultimately would only increase costs for consumers." (*Id.* at p. 1197.)

The reasoning employed by the court in *Utility Cost Management v. Indian Wells Valley Water Dist., supra,* 26 Cal.4th 1185, has obvious application here. As the agency points out, the deficiency in the agency's payments to its Housing Fund were the subject of public meetings and public records. There was no attempt by the agency to conceal its payment to the Housing Fund. As in *Utility Cost Management v. Indian Wells Valley Water Dist.,* a diligent plaintiff should have been able to discover whether a cause of action existed. Moreover, consistent with the concerns expressed in both *Utility Cost Management v. Indian Wells Valley Water Dist.* and *Green v. Obledo,* redevelopment agencies could not operate with any fiscal certainty if, by virtue of application of a discovery rule, there was essentially no limit on the time in which their calculation of amounts due their respective Housing Funds could

be challenged. In this regard it is also important to note once again that Hogar had no direct beneficial interest in increasing reimbursements to the Housing Fund. Under *Green v. Obledo* this fact suggests that rather than tolling the statute of limitations under a discovery rule, equity might intervene to shorten the limitations period. (*Green v. Obledo, supra,* 29 Cal.3d at page 142.)

We recognize that in *Craig v. City of Poway, supra,* 28 Cal.App.4th at page 342, two individual plaintiffs suing to enforce provisions of the CRL were given the benefit of a discovery rule. However, in deciding *Craig v. City of Poway,* the court did not have the benefit of *Utility Cost Management v. Indian Wells Valley Water Dist.* Moreover, the subject of the claim in *Craig v. City of Poway* was a single expenditure of Housing Fund money on a road project. The record also showed there was no public notice of the agency's violation of the CRL. Thus in *Craig v. City of Poway* there were none of the fiscal or equitable considerations present here. In light of these circumstances, *Craig v. City of Poway* does not require application of a discovery rule in this case.

■ Because the trial court applied a discovery rule, it required the agency to reimburse the Housing Fund for each year after 1985 in which the agency failed to pay the 20 percent required by the CRL. In light of this error the judgment must be reversed and remanded for determination of how much reimbursement is required under the principles set forth in *Utility Cost Management v. Indian Wells Valley Water Dist.* and *Green v. Obledo.*

## II*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed insofar as it directs that the agency reimburse the Housing Fund for insufficient payment of tax increment funds and insofar as the judgment finds the city liable for the agency's obligations under the CRL. The cause is remanded for further proceedings consistent with the views we have expressed on these two issues. In all other respects the judgment is affirmed. Each party to bear its own costs.

Kremer, P. J., and McDonald, J., concurring.

A petition for a rehearing was denied August 25, 2003, and the petition of appellant Hogar Dulce Hogar for review by the Supreme Court was denied October 29, 2003.

*See footnote 1, *ante,* page 1288.