[No. B071317. Second Dist., Div. One. Nov. 18, 1993.]

LANCASTER REDEVELOPMENT AGENCY, Plaintiff and Respondent,
v.
DOLORES DIBLEY et al., Defendants and Appellants.

## COUNSEL

Kane, Ballmer & Berkman, Murray O. Kane, R. Bruce Tepper, Jr., and Kathryn Reimann for Defendants and Appellants.

Stradling, Yocca, Carlson & Rauth, David R. McEwen and David H. Mann for Plaintiff and Respondent.

Richards, Watson & Gershon, Glenn R. Watson and Marsha Jones Moutrie as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**VOGEL (Miriam A.), J.**—The question in this case is whether the Lancaster Redevelopment Agency may issue bonds secured by funds earmarked for low- and moderate-income housing to fund an "improvement" which has little, if anything, to do with the construction of affordable housing for the persons intended to be benefitted by the Community Redevelopment Law (CRL), section 33000 et seq. of the Health and Safety Code.[1] Our answer is no.

### OVERVIEW OF THE CRL

#### A.

In concept, the CRL was intended to help local governments revitalize blighted communities by reversing the decline of urban slum neighborhoods or areas which, due to physical or economic factors, have been rendered economically useless and a liability to the community. In fact, the CRL has sometimes been misused to subsidize a city's economic development through the diversion of property tax revenues from other taxing entities, a feat made possible by section 33670.[2] As a result, various restrictions are placed on redevelopment under the CRL, to ensure that tax dollars allocated for redevelopment are properly used. For example, the redevelopment power may be exercised only when necessary to alleviate problems associated with blight. (§§ 33367, subd. (d)(1), 33030 et seq.; *Leach* v. *City of San Marcos* (1989) 213 Cal.App.3d 648, 653 [261 Cal.Rptr. 805].) For another example, a redevelopment agency may not use its funds to pay for the normal maintenance or operation of publicly owned buildings or other facilities. (§ 33445.) As another form of limitation, redevelopment funds may be legislatively earmarked for purposes consistent with the CRL's major goals.

#### B.

One of the fundamental goals of the CRL is to increase the supply of low- and moderate-income housing (which we henceforth refer to simply as "affordable" housing). (§ 33071.) To this end, the CRL requires that at least 20 percent of the tax increment (the tax benefit allocated to a redevelopment agency pursuant to section 33670) must be used to increase, improve and

---

[1]Unless otherwise stated, all section references are to the Health and Safety Code.

[2]Under section 33670, tax revenues available for local agencies from land within the boundaries of a redevelopment plan are frozen as of the date the plan is adopted and any tax revenues generated by an increase in property values after adoption of the plan (the tax increment) are paid exclusively to the local redevelopment agency to pay the principal and interest on any indebtedness incurred by the agency to finance the redevelopment project.

preserve the supply of affordable housing (§ 33334.2, subd. (a)) and permits the agency to use its powers to "[i]mprove real property or building sites with onsite or offsite improvements, *but only if* either (A) *the improvements are made as part of a program which results in the new construction or rehabilitation of affordable housing units for low- or moderate-income persons that are directly benefited by the improvements* or (B) the agency finds that the improvements are necessary to eliminate a specific condition that jeopardizes the health or safety of existing low- or moderate-income residents." (§ 33334.2, subd. (e)(2), italics added.)

## FACTS

The City of Lancaster wants to build two overpasses to provide access over a railroad right-of-way to presently undeveloped, open desert area approved for future development as a "business park." In search of funding for the overpasses, the City turned its attention to the CRL and in November 1991, the Lancaster Redevelopment Agency (which is administered by the members of the Lancaster City Council) approved a Low- and Moderate-Income Housing Incentive Program (LMIHIP). According to the Agency, the dual goals of the LMIHIP are to encourage housing developers to construct affordable housing and, at the same time, to create a fund to pay for the construction of the overpasses.

### A.

The LMIHIP is set up to work like this: The Redevelopment Agency and the City will enter an agreement, pursuant to which the Agency will purchase $24 million worth of "TIF offsets" from the City. (TIFs are Traffic Impact Fees, which is what housing developers are required to pay to the City for each residential unit to be constructed in the City, to be used by the City to pay for roads and other improvements for the new housing development. As we explain below, "offsets" are what the developer will receive for participating in the LMIHIP.) The Agency will pay for the TIF offsets with a portion of the proceeds received from the Agency's issuance of about $30 million in bonds (formally referred to as Housing Tax Allocation Notes). The bonds will be secured by the portion of the tax increment dedicated to affordable housing.[3]

Once the agreement is in place, the Agency will pay $24 million of the bond proceeds to the City to purchase $24 million worth of TIF offsets

---

[3]The portion of the tax increment allocated for affordable housing must be held in segregated "Low and Moderate Income Housing Funds" until used, and any interest or other income generated by these Funds must accrue to the Funds and may be used only as described in the CRL. (§ 33334.3, subds. (a), (b).) The CRL also requires that money earmarked for affordable housing be timely expended and that any surplus be transferred to the local housing authority for the development of affordable housing. (§§ 33334.10, 33334.12.)

(these offsets are "banked" by the Agency, to be used as needed) and the City, in turn, will use the $24 million to build its overpasses. Thereafter, any developer who chooses to participate in the LMIHIP (participation is voluntary) will receive from the City an offset equal to 90 percent of the TIF which would otherwise be required for the housing project, in exchange for which the developer must agree to dedicate a certain percentage of the project to affordable housing units.[4] The concept is that the barrier of TIFs would be alleviated by the offsets and that developers would thus be encouraged to build more affordable housing—but there is no way to determine from the LMIHIP whether the developers' profits would be detrimentally affected by including affordable housing within a planned project.[5] Developers who elect not to participate in the LMIHIP would pay the City the usual TIFs and build their projects as originally envisioned. As to these nonparticipating developers, 90 percent of their TIFs (the amount which would have been offset had they participated in the LMIHIP) would be reimbursed to the Agency by the City.[6]

In short, to the extent developers participate in the LMIHIP, there will be an increase in the number of new affordable housing units. To the extent they don't participate, the Agency will be reimbursed for the money advanced to the City to purchase the unused TIF offsets. In either event, the City gets its $24 million up front and it gets to build its overpasses. There is no assurance, however, that any developer will elect to participate in the LMIHIP or that any affordable housing will be built.

[4]For example: In a residential project consisting of 200 single-family units and 1,000 multifamily units, the required TIF paid by the developer to the City at the City's current TIF rates ($1,044.16 per single-family unit and $929.19 per multifamily unit) would be $1,102,736. By participating in the LMIHIP, the developer would receive offsets of (and thus save) 90 percent of that amount ($992,462) in exchange for the developer's commitment to build 12.5 percent of the single-family units and 13.5 percent of the multifamily units as affordable housing. For each participating project, a portion of the banked offsets will be paid to the City by the Agency to cover the developer's TIF obligations for traffic improvements. Of course, this would be no more than a series of bookkeeping entries because the City would have already received the entire $24 million and spent it to pay for the overpasses. Apparently it would be the City's problem, not the Agency's, to figure out how it was going to find real money to pay for the roads needed to complete the housing project.

[5]As the Agency concedes, its concept of integrating affordable housing into "market rate" housing developments (as opposed to separate affordable housing projects) is "innovative." The Agency nevertheless fails to explain why it believes the incentive of the TIF offset is sufficient to persuade a developer to mix the two types of housing and to run the risk of reducing the value of its market rate units. The Agency's failure to explain the point supports an inference that the LMIHIP is nothing more than a creative effort by the City Council, wearing its Redevelopment Agency hat, to find money to pay for its long awaited overpasses.

[6]Under the LMIHIP, the City would collect the full amount of the TIF from the nonparticipating developer and then reimburse the Agency at the rate of 90 percent of the unused TIF offset. Assuming a TIF rate of $1,000 per unit, the City would pay the Agency $900 for each $1,000 collected.

### B.

On November 4, 1991, the Agency approved the LMIHIP "concept" and authorized the issuance and sale of $30 million in bonds to fund the LMIHIP. On November 21, the Agency filed this validation action to obtain a judgment confirming its adoption of the LMIHIP and its approval of the bonds (§ 33501; Code Civ. Proc., § 860 et seq.). Dolores Dibley (a City of Lancaster taxpayer) answered, attacking the LMIHIP on the ground (among others) that it is illegal because it will use funds which should be set aside for affordable housing to construct overpasses to benefit business interests which do not directly or specifically improve the supply of affordable housing.

On cross-motions for summary judgment, the trial court found the overpasses would "directly and specifically" increase the supply of low- and moderate-income housing because, "without access, that area [on the other side of the railroad right-of-way] remains . . . [a] desert with Joshua trees . . . . [N]o one is going to develop any of that area until there is access . . . . [T]he problem is that if we follow [Dibley's] thinking literally, we would be building low income houses in areas that no one could get to." Judgment was entered in favor of the Agency and Dibley appeals.

### DISCUSSION

Relying on the language of section 33334.2, subdivision (e)(2), as it existed at the time the LMIHIP was approved (Nov. 1991), Dibley contends the LMIHIP does not satisfy the CRL. Relying on a subsequent amendment to the statute, the Agency says it does. We agree with the Agency that the amended statute is controlling but disagree with the Agency's claim that it has met its statutory obligations.

### A.

In November 1991, subdivision (e)(2) of section 33334.2 provided that, "[i]n carrying out the purpose of this section, the agency may exercise any or all of its powers, including [its power to i]mprove real property or building sites with on site or off site improvements, *but only if the improvements directly and specifically improve or increase the community's supply of low- or moderate-income housing*." (Stats. 1990, ch. 1350, § 3, eff. Sept. 26, 1990; italics added.)

As presently drafted, subdivision (e)(2) of section 33334.2 (as relevant) permits agencies to "[i]mprove real property or building sites with onsite or

offsite improvements, *but only if . . . the improvements are made as part of a program which results in the new construction or rehabilitation of affordable housing units for low- or moderate-income persons that are directly benefited by the improvements . . . .*" (Stats. 1992, ch. 1356, § 8, eff. Jan. 1, 1993, italics added.)

This lawsuit seeks validation of the Agency's future actions (the LMIHIP has not been implemented pending resolution of this litigation) and thus must be reviewed in light of the CRL's current language. (Cf. *Citizens for Non-Toxic Pest Control* v. *Department of Food & Agriculture* (1986) 187 Cal.App.3d 1575, 1584 [232 Cal.Rptr. 729].) Accordingly, the question is whether the overpasses (the offsite improvement of real property) will be built as part of a program which will result in the new construction of affordable housing for low or moderate income persons who will be benefitted by the overpasses.[7]

### B.

The LMIHIP does not explain how it is that the overpasses will be part of a program which will result in the new construction of affordable housing or how the overpasses will benefit the persons who would occupy affordable housing, and we find unpersuasive the Agency's efforts to supply answers to these questions.

### 1.

Under the plain language of the statute, an Agency may legitimately undertake efforts to increase the supply of affordable housing by innovative projects which do not include the present construction of new units. But its efforts at innovation in the form of offsite improvements of real property are (as we have explained) limited to improvements "made as part of a program which results in the new construction . . . of affordable housing units for low- or moderate-income persons [who] are directly benefited by the improvements . . . ." (§ 33334.2, subd. (e)(2).) Clearly, the construction of the overpasses is an offsite improvement within the meaning of section 33334.2, subdivision (e)(2). (Cf. *South Central Coast Regional Com.* v. *Charles A.*

---

[7]After the trial court rendered judgment (indeed, after Dibley had filed her opening brief on appeal), the Agency adopted a revised LMIHIP which (1) scales back the size of the project, from $24 million to $8 million, and (2) deletes the specific reference to the City's use of the money for the two overpasses, replacing it with a statement that the money will be used for general traffic improvements. We summarily reject the Agency's disingenuous suggestion that we review the revised LMIHIP. As always, we review that which was before the trial court, no more and no less. (*Olincy* v. *Merle Norman Cosmetics, Inc.* (1962) 200 Cal.App.2d 260, 275-276 [19 Cal.Rptr. 387].)

*Pratt Construction Co.* (1982) 128 Cal.App.3d 830, 835 [180 Cal.Rptr. 555]. What is missing is the nexus between the overpasses and affordable housing.

### 2.

The Agency contends the overpasses will open up the now barren desert land beyond the railroad right-of-way to development in general. It follows, says the Agency, that housing will be built and, therefore, that affordable housing opportunities will necessarily follow. We disagree.

Although it may be true, as the Agency claims, that the area to be accessed by the overpasses "has a full build-out potential of 45,000 housing units," there is no evidence in the record to show that this potential will be fulfilled. The *only* development presently contemplated is a business park comprised of commercial and industrial buildings, with no residential component. We can find no plans, proposals or any hint at all of new housing, affordable or market priced.[8] Pure speculation (which is all there is) is not enough because it does not show that the program is one "which results" in new affordable housing.

The Agency's assertion that the LMIHIP "reasonably projects" construction of 2,850 new affordable units finds no support in the record. Generously construed, the LMIHIP does say that *if* the entire $24 million worth of TIF offsets purchased by the Agency is eventually used by developers who elect to participate in the program, *then* (and only then) will 2,850 new affordable housing units be built. But there is nothing in the LMIHIP or elsewhere in the record to suggest that *any* developer will opt into the program and, as noted above, the result may well be that all or most developers will opt out. Not a single unit of affordable housing is guaranteed.

Indeed, there is nothing in the record to suggest that any developer is interested in this type of "innovative" housing arrangement. There are no plans, no historical facts, no survey results. In short, there is nothing to suggest this entire plan is anything more than a scheme to divert restricted

---

[8]Planning documents prepared for the overpasses (including an Environmental Impact Report) are silent on the subject of housing. These documents show the overpasses are needed not for housing but for safety and convenience, to provide a loop to the presently vacant area, to improve traffic circulation, and to promote "industrial growth" in the area by improved access. And it does not help the Agency's position that the City's 1992 General Plan questions the suitability of this property for any housing at all because of the "proximity of industrial development and high noise levels from the railroad and aircraft operations from [Air Force] Plant 42." The trial court's comment that no housing will ever be built without access to the area is interesting but irrelevant to the determination whether the overpasses are part of a program which will, in fact, result in the construction or rehabilitation of affordable housing.

housing funds to the City to pay for the construction of the overpasses. The LMIHIP is no more than an illusory promise by the City that, "if you give us the money to build our overpasses now, then *maybe*, at some point in the future, there *might* be a developer who chooses to participate and agrees to construct affordable housing." Politely stated, that is not enough, and we therefore do not reach Dibley's other claims of error.

### DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with directions to enter a judgment in favor of Dibley and against the Agency. Dibley is entitled to recover her costs of appeal.

Spencer, P. J., and Ortega, J., concurred.

A petition for a rehearing was denied December 20, 1993, and respondent's petition for review by the Supreme Court was denied February 24, 1994. Kennard, J., was of the opinion that the petition should be granted.