TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

_____

| | | |
|---|---|---|
| OPINION | : | |
| | : | No. 98-406 |
| of | : | |
| | : | August 27, 1998 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| ANTHONY M. SUMMERS | : | |
| Deputy Attorney General | : | |
| | : | |

_____

THE HONORABLE WILLIAM A. CRAVEN, MEMBER OF THE CALIFORNIA SENATE, has requested an opinion on the following questions:

1. What was the deadline for a community redevelopment agency to transfer to a housing authority "excess surplus" money in its Low and Moderate Income Housing Fund identified as of July 1, 1994?

2. Does Health and Safety Code section 33334.2 permit a community redevelopment agency to spend money in its Low and Moderate Income Housing Fund outside the boundaries of the community?

3. When a community redevelopment agency uses a nonprofit corporation to administer its housing activities, is the corporation required to comply with the same laws and regulations as the agency, including open meeting laws, acquisition and relocation requirements, and public bidding and prevailing wage statutes?

4. If a community redevelopment agency's activities with respect to the use of money in its Low and Moderate Income Housing Fund are not permitted by state law, what remedies exist for state agencies, local agencies, and private citizens to require a redevelopment agency's compliance with state law?

CONCLUSIONS

1. The deadline for a community redevelopment agency to transfer to a housing authority "excess surplus" money in its Low and Moderate Income Housing Fund identified as of July 1, 1994, was January 1, 1995.

2. Health and Safety Code section 33334.2 does not permit a community redevelopment agency to spend money in its Low and Moderate Income Housing Fund outside the

boundaries of the community.

3.      When a community redevelopment agency uses a nonprofit corporation to administer its housing activities, the corporation is required to comply with the same laws and regulations as the agency, including open meeting laws, acquisition and relocation requirements, and public bidding and prevailing wage statutes.

4.      If a community redevelopment agency's activities with respect to the use of money in its Low and Moderate Income Housing Fund are not permitted by state law, bond holders, affected individuals or organizations, taxpayers, and the Attorney General may institute legal proceedings to require a redevelopment agency's compliance with state law.

ANALYSIS

The Legislature has adopted a comprehensive statutory scheme, the Community Redevelopment Law (Health & Saf. Code, §§ 33000-37964; "Law") **Footnote No. 1** "[t]o protect and promote the sound development and redevelopment of blighted areas and the general welfare of the inhabitants of communities in which they exist . . ." (§ 33037, subd. (a)). Under provisions of the Law, there is "in each community a public body, corporate and politic, known as the redevelopment agency of the community." (§ 33100.) "Redevelopment" is defined in the Law as follows:

"'Redevelopment'" means the planning, development, replanning, redesign, clearance, reconstruction, or rehabilitation, or any combination of these, of all or part of a survey area, and the provision of those residential, commercial, industrial, public, or other structures or spaces as may be appropriate or necessary in the interest of the general welfare, including recreational and other facilities incidental or appurtenant to them . . . ." (§ 33020.)

The funding mechanism provided for community redevelopment is known as "tax increment financing." (*Redevelopment Agency* v. *County of San Bernardino* (1978) 21 Cal.3d 255, 259.) This financing system anticipates that redevelopment will increase tax revenues produced by a community by virtue of the increased valuation of property, thus raising the tax base. (*Bell Community Redevelopment Agency* v. *Woolsey* (1985) 169 Cal.App.3d 24, 27.)

While the main purpose of redevelopment is to eliminate and rehabilitate blighted areas (§§ 33030-33037), the Legislature has declared that redevelopment should also "expand the supply of low- and moderate-income housing." (§ 33071.) Accordingly, a portion of the tax revenues allocated to a redevelopment agency must be used to increase, improve, and preserve the community's supply of low- and moderate-income housing. (§§ 33334.2, 33334.6.) The funds to be used for these purposes are held in a separate Low and Moderate Income Housing Fund ("Fund") until used. (§ 33334.3.)

The four questions presented for resolution concern a community redevelopment agency's use of money in its Fund. In answering these questions, we will apply well established principles of statutory construction. "To interpret statutory language, we must 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.]" (*California Teachers Assn.* v. *Governing Bd. Of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 632.) "[W]e interpret a statute in context, examining other legislation on the same subject, to determine the Legislature's probable intent. [Citation.]" (*Id.*, at p. 642.) "Committee reports are often useful in determining the Legislature's intent. [Citation.]" (*Id.*, at p. 646.) "[A] court may consider the consequences that would follow from a particular construction and will not readily imply an unreasonable legislative purpose." (*California Correctional Peace Officers Assn.* v. *State Personnel Bd.* (1995) 10 Cal.4th 1133, 1147.)

1.      Deadline for Transferring Excess Surplus

The first question to be addressed concerns the deadline for transferring to a housing authority certain "excess surplus" money in an agency's Fund. We conclude that the deadline for transferring such money identified as of July 1, 1994, to a housing authority was January 1, 1995.

A redevelopment agency is not permitted to accumulate money in its Fund indefinitely. The Legislature has established a limitation on the amount that may be accumulated in the Fund and has declared money in excess of that limit to be "excess surplus." Subdivision (g) of section 33334.12 states in part:

"(1) 'Excess surplus' means any unexpended and unencumbered amount in an agency's Low and Moderate Income Housing Fund that exceeds the greater of one million dollars ($1,000,000) or the aggregate amount deposited into the Low and Moderate Income Housing Fund pursuant to Sections 33334.2 and 33334.6 during the agency's preceding four fiscal years. The first fiscal year to be included in this computation is the 1989-90 fiscal year, and the first date on which an excess surplus may exist is July 1, 1994.

"(2) Moneys shall be deemed encumbered if committed pursuant to a legally enforceable contract or agreement for expenditure for purposes specified in Section 33334.2 or 33334.3."

If a redevelopment agency fails to spend or encumber excess surplus money in its Fund within one year from the date the money becomes excess surplus, it must generally disburse the excess surplus to the county housing authority or similar public agency or spend or encumber the excess surplus within two additional years. (§ 33334.12, subd. (a)(1).)

The specific issue to be resolved concerns excess surplus money identified as of July 1, 1994, the first date on which an excess surplus could exist. (§ 33334.12, subd. (g)(1).) The governing statutory provision is section 33334.12, subdivision (i):

"Notwithstanding subdivision (a), any agency that has funds that become excess surplus on July 1, 1994, shall have, pursuant to subdivision (a), until January 1, 1995, to decide to transfer the funds to a housing authority or other public agency, or until January 1, 1997, to expend or encumber those funds, or face sanctions pursuant to subdivision (e)."

Thus, while the Legislature has generally established a one-year period following the identification of excess surplus money for transfer of the money to a housing authority, it set a six-month limit for the transfer of money that became excess surplus on July 1, 1994. This provision was added in 1993 (Stats. 1993, ch. 942, § 11), and became effective January 1, 1994.

We reject the suggestion that the actual transfer of money to a housing authority need not have been made by January 1, 1995, but only the *decision* to transfer the money. In subdivision (a) of section 33334.12, an agency is given two options with respect to the disposition of excess surplus money. It may disburse the money to a housing authority within one year or may retain the money and spend or encumber it within an additional two years. The clear import of section 33334.12, subdivision (i), is to limit the time period for both of these options with respect to excess surplus money that existed on July 1, 1994. The agencies were given until January 1, 1995, to transfer excess money to a housing authority or an additional two years (until January 1, 1997) to spend or encumber the money if no transfer was made. As in the case of the general rule established by subdivision (a), there is a two-year period following the last date upon which the money could be transferred to a housing authority in which the agency is to spend or encumber the funds. **Footnote No. 2**

That January 1, 1995 was the deadline for the transfer of excess surplus money existing on

July 1, 1994 is confirmed by the legislative history of the 1993 amendment of section 33334.12 which added the requirement. For example, the Assembly Bill Analysis dated September 10, 1993, stated that the purpose of the legislation was to require:

> ". . . that any agency which has funds which become excess surplus on July 1, 1994, *has until January 1, 1995 to transfer the money* or until January 1, 1997 to encumber those moneys or face the new statutory penalties." (Italics added.)

It must be remembered that a community redevelopment agency is not mandated by the Legislature to transfer excess surplus money to a housing authority. Rather, it is given a window of opportunity to do so, and once that opportunity has passed, the agency has an additional two years to spend or encumber the funds without suffering any sanctions. The effect of subdivision (i) of section 33334.12 is to limit the extent of the window of opportunity to transfer excess surplus money identified as of July 1, 1994.

We conclude that the deadline for a community redevelopment agency to transfer to a housing authority excess surplus money in its Fund identified as of July 1, 1994, was January 1, 1995.

2.        Spending Money Outside the Community

As noted above, providing for low- and moderate-income housing is one of the purposes of community redevelopment. The Legislature has directed each redevelopment agency to set aside 20 per cent of the taxes allocated to it which "shall be used by the agency for the purposes of increasing, improving, and preserving the community's supply of low- and moderate-income housing . . . ." (§ 33334.2.) **Footnote No. 3** "Community" is defined in the Law as follows:

> "'Community' means a city, county, city and county, or Indian tribe, band, or group which is incorporated or which otherwise exercises some local governmental powers." (§ 33002.)

Thus, the directive to increase, improve, and preserve the "community's" supply of affordable housing would ordinarily apply to affordable housing within the city or county in which the redevelopment agency operates.

The second question presented is whether a community redevelopment agency is permitted by section 33334.2 to spend money in its Fund outside the boundary of the community. For example, may a redevelopment agency provide money for the rehabilitation of a building outside the community, but with an enforceable agreement reserving a specified portion of the building for homeless veterans from within the community? We conclude that such extraterritorial expenditures are not authorized under the terms of section 33334.2. **Footnote No. 4**

The relevant portions of section 33334.2 provide:

> "(a) Not less than 20 percent of all taxes which are allocated to the agency pursuant to Section 33670 shall be used by the agency for the purposes of increasing, improving, and preserving the community's supply of low- and moderate-income housing available at affordable housing cost, as defined by Section 50052.5, to persons and families of low or moderate income, as defined in Section 50093, and very low income households, as defined in Section 50105 . . . .

> ". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

> "(e) In carrying out the purposes of this section, the agency may exercise any or all of its powers, including the following:

> "(1) Acquire real property or building sites subject to Section 33334.16.

"(2) Improve real property or building sites with onsite or offsite improvements, but only if either (A) the improvements are made as part of a program which results in the new construction or rehabilitation of affordable housing units for low- or moderate-income persons that are directly benefited by the improvements or (B) the agency finds that the improvements are necessary to eliminate a specific condition that jeopardizes the health or safety of existing low-or moderate-income residents.

"(3) Donate real property to private or public persons or entities.

"(4) Finance insurance premiums pursuant to Section 33136.

"(5) Construct buildings or structures.

"(6) Acquire buildings or structures.

"(7) Rehabilitate buildings or structures.

"(8) Provide subsidies to, or for the benefit of, very low income households, as defined by Section 50105, lower income households, as defined by Section 50079.5, or persons and families of low or moderate income, as defined by Section 50093, to the extent those households cannot obtain housing at affordable costs on the open market. Housing units available on the open market are those units developed without direct government subsidies.

"(9) Develop plans, pay principal and interest on bonds, loans, advances, or other indebtedness, or pay financing or carrying charges.

"(10) Maintain the community's supply of mobilehomes.

"(11) Preserve the availability to lower income households of affordable housing units in housing developments which are assisted or subsidized by public entities and which are threatened with imminent conversion to market rates.

"(f) The agency may use these funds to meet, in whole or in part, the replacement housing provisions in Section 33413. However, nothing in this section shall be construed as limiting in any way the requirements of that section.

"(g) The agency may use these funds inside or outside the project area. The agency may only use these funds outside the project area upon a resolution of the agency and the legislative body that the use will be of benefit to the project. The determination by the agency and the legislative body shall be final and conclusive as to the issue of benefit to the project area. The Legislature finds and declares that the provision of replacement housing pursuant to Section 33413 is always of benefit to a project. Unless the legislative body finds, before the redevelopment plan is adopted, that the provision of low- and moderate-income housing outside the project area will be of benefit to the project, the project area shall include property suitable for low- and moderate-income housing."

Subdivision (g) of section 33334.2 authorizes a redevelopment agency to use funds "outside the project area." However, a "project area" is not the same as the "community." Essentially, a project area is a "predominantly urbanized area of a community" that suffers from blight and is being redeveloped. (§ 33320.1.) A project area is thus part of a city or county, and while a city or county may have multiple project areas, authorization to expend funds on affordable housing outside a project area is not the same as authorizing an expenditure of funds outside the city or county.

Section 33334.2, subdivision (e)(2), authorizes an agency to make "offsite improvements," provided they are made in connection with a program that will result in the provision of new or rehabilitated affordable housing. (See *Craig* v. *City of Poway* (1994) 28 Cal.App.4th 319; *Lancaster Redevelopment Agency* v. *Dibley* (1993) 20 Cal.App.4th 1656.) "Offsite" cannot reasonably be construed to mean anywhere in the state. Nothing in subdivision (e)(2) of section 33334.2 authorizes a project improvement outside the city or county in which the agency is operating.

Subdivision (e)(8) of section 33334.2 authorizes a redevelopment agency to grant subsidies to certain low-income persons to permit them to obtain housing. Nothing in subdivision (e)(8) itself indicates that the subsidies may be used outside the boundaries of the city or county. The subsidies are to be used when "households cannot obtain housing at affordable costs on the open market . . . developed without direct government subsidies." (§ 33334.2, subd. (e)(8).) Persons no longer residing in the community would no longer be residents of the city or county. The express purpose of subdivision (e) of section 33334.2 is to help "[i]n carrying out the purposes of this section," which are described in subdivision (a) of the statute as "increasing, improving, and preserving the community's supply of low- and moderate-income housing available at affordable housing cost." Providing subsidies for use outside the boundaries of the city or county would not serve the purposes of section 33334.2.

In sum, we conclude that section 33334.2 does not permit a community redevelopment agency to spend money in its Fund outside the boundaries of the community. **Footnote No. 5**

3.　　　　Responsibilities of a Nonprofit Corporation

We are informed that some community redevelopment agencies provide money in their Funds to nonprofit corporations for the purpose of increasing, improving, and preserving affordable housing. For example, one agency has formed a nonprofit corporation to administer its housing activities, with agency employees performing the activities on behalf of the corporation and the agency retaining approval power over the corporation's budget. The third question presented for analysis is whether a nonprofit corporation that administers a community redevelopment agency's housing activities is required to comply with the same laws and regulations as the agency itself, including open meeting laws, acquisition and relocation requirements, and public bidding and prevailing wage statutes. We conclude generally that it must.

The open meeting laws in question here are contained in the Ralph M. Brown Act (Gov. Code, §§ 54950-54962), which requires all meetings of the "legislative body" of a "local agency" to be open to the public. (Gov. Code, § 54953, subd. (a).) The definition of "local agency" (Gov. Code, § 54951) clearly encompasses a community redevelopment agency. The term "legislative body" is defined in Government Code section 54952 as follows:

"As used in this chapter, 'legislative body' means:

"(a) The governing body of a local agency or any other local body created by state or federal statute.

"(b) A commission, committee, board, or other body of a local agency, whether permanent or temporary, decisionmaking or advisory, created by charter, ordinance, resolution, or formal action of a legislative body. However, advisory committees, composed solely of the members of the legislative body which are less than a quorum of the legislative body are not legislative bodies, except that standing committees of a legislative body, irrespective of their composition, which have a continuing subject matter jurisdiction, or a meeting schedule fixed by charter, ordinance, resolution, or formal action of a legislative body are legislative bodies for purposes of this chapter.

"(c) (1) A board, commission, committee, or other multimember body that governs a private corporation or entity that either:

"(A) Is created by the elected legislative body in order to exercise authority that may lawfully be delegated by the elected governing body to a private corporation or entity.

"(B) Receives funds from a local agency and the membership of whose governing body includes a member of the legislative body of the local agency appointed to that governing body as a full voting member by the legislative body of the local agency.

"(2) Notwithstanding subparagraph (B) of paragraph (1), no board, commission, committee, or other multimember body that governs a private corporation or entity that receives funds from a local agency and, as of February 9, 1996, has a member of the legislative body of the local agency as a full voting member of the governing body of that private corporation or entity shall be relieved from the public meeting requirements of this chapter by virtue of a change in status of the full voting member to a nonvoting member.

"(d) The lessee of any hospital the whole or part of which is first leased pursuant to subdivision (p) of Section 32121 of the Health and Safety Code after January 1, 1994, where the lessee exercises any material authority of a legislative body of a local agency delegated to it by that legislative body whether the lessee is organized and operated by the local agency or by a delegated authority."

Subdivision (c) of Government Code section 54952 includes within the definition of "legislative body" the governing board of a private corporation created by the agency's legislative body to exercise authority delegated by the agency or which receives funds from the agency and an agency member sits as a voting director of the corporation. (See 80 Ops.Cal.Atty.Gen. 270, 273-274 (1997).) In the facts presented here, the nonprofit corporation formed by the redevelopment agency would be subject to the Ralph M. Brown Act. We conclude that the governing board of a nonprofit corporation formed by a community redevelopment agency to carry out functions delegated to it by the agency must conduct its meetings in public, as well as a nonprofit corporation not created by the agency but where the corporation receives funds from the agency and a member of the agency's legislative body sits as a voting director of the corporation.

A community redevelopment agency must also comply with certain statutory procedures with respect to creating and consulting residents and community organizations within a redevelopment project area (§§ 33385-33388), acquiring real property (§§ 33390-33399), and planning for relocation of persons displaced from housing facilities in a redevelopment project area (§§ 33367, 33411-33417.5). In connection with carrying out certain projects, a community redevelopment agency is also required to comply with various bidding requirements (§ 33422.3), prevailing wage requirements by contractors (§ 33423) and subcontractors (§ 33424), and general bidding requirements (Pub. Contract Code, §§ 20688.1-20688.25).

We do not believe these statutory requirements, many of which are intended to benefit persons within a redevelopment project area, may be avoided by delegating administrative responsibilities to a nonprofit corporation. A redevelopment agency may not circumvent legislative requirements through the device of assigning administrative responsibilities to a nonprofit corporation which is subject to its control. When a redevelopment agency is using a nonprofit corporation to carry out its governmental responsibilities, the corporation must comply with acquisition and relocation requirements and public bidding and prevailing wage statutes.

4.    Remedies for Violations

Finally, we are asked what remedies are available to state and local agencies and private citizens in the event a redevelopment agency has not complied with state law in administering the money in

its Fund.

The Act contemplates judicial review of a community redevelopment agency's actions, without specifying who may bring such an action. (§ 33334.2, subd. (c).) Specific procedures, however, have been established for judicial review of the validity of redevelopment plans and the bonds to finance the plans. (§§ 33500 - 33503.) Additional rights to bring suit to compel fulfillment of an agency's obligations or to enjoin unlawful actions are conferred upon bond holders. (§§ 33660-33661.)

Aside from these express provisions in the Law, a redevelopment agency may be subject to a taxpayer's suit. (See, e.g., *Craig* v. *City of Poway, supra,* 28 Cal.App.4th 319; *Lancaster Redevelopment Agency* v. *Dibley, supra,* 20 Cal.App.4th 1656.) As the chief law officer of the state (Cal. Const., art. V, § 13; Gov. Code, §§ 12500-12612; *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 14-15; 76 Ops.Cal.Atty.Gen. 157, 160-161 (1993)), the Attorney General has the power to bring actions to enforce state law (*Pierce* v. *Superior Court* (1934) 1 Cal.2d 759). Thus, while no specific agency is given oversight responsibilities with respect to community redevelopment agencies, various means are available by which judicial review of an agency's actions may be obtained.

We conclude in answer to the fourth question that if a community redevelopment agency's activities with respect to the use of money in its Fund are not permitted by state law, bond holders, affected individuals or organizations, taxpayers, and the Attorney General may institute legal proceedings to require a redevelopment agency's compliance with state law.

\* \* \* \* \*

**Footnote No. 1**
All statutory references hereafter are to the Health and Safety Code unless otherwise designated.
**Footnote No. 2**
Failure to comply with the statutory deadlines results in various sanctions imposed upon the agency. (§ 33334.12, subd. (e).)
**Footnote No. 3**
Taxes are allocated to a redevelopment agency pursuant to section 33670, the language of which is taken directly from article XVI, section 16, of the Constitution. Both the statute and the constitutional provision provide that the tax revenues allocated to a redevelopment agency are to pay the principal and interest on loans, moneys advanced to, or indebtedness incurred by the agency to finance a redevelopment project. Costs associated with the provision of affordable housing pursuant to section 33334.2 constitute an "indebtedness" under section 33801. (See *Marek* v. *Napa Community Redevelopment Agency* (1988) 46 Cal.3d 1070, 1082 ["indebtedness" encompasses all redevelopment agency obligations].)
**Footnote No. 4**
The scope of this question is limited to the grant of authority contained in section 33334.2 . (See § 33334.17.

**Footnote No. 5**
Accordingly, we do not consider the suggestion that such expenditures outside the boundaries of the community would contravene article XVI, section 16 of the Constitution.